Joseph OLIVERI, Plaintiff–Appellee,

v.

DELTA STEAMSHIP LINES, INC. and Crowley Maritime Corp., Defendants–Appellants and Third–Party Plaintiffs,

v.

MIDLAND–ROSS CORPORATION, Third–Party Defendant.

No. 409, Docket 87–7672.

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1987.

Decided June 13, 1988.

William M. Kimball, New York City (Steven L. Barkan, John J. Walsh, New York City, on the brief), for defendants-appellants and third-party plaintiffs.

Steven Thaler, New York City, for plaintiff-appellee.

Before FEINBERG, Chief Judge, NEWMAN and WINTER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal primarily concerns the method of discounting damage awards to present value and the propriety of applying a present value discount to damages for future pain and suffering. Defendants Delta Steamship Lines, Inc. and Crowley Maritime Corp. (collectively "Delta") appeal from a judgment of the District Court for the Southern District of New York (Whitman Knapp, Judge) entered after a jury trial, awarding damages in favor of plaintiff Joseph Oliveri, and from the District Court's orders denying Delta's post-trial motions. Oliveri brought this action under the Jones Act, 46 U.S.C.App. § 688 (1982), for injuries he suffered while working on defendant's vessel. Delta conceded liability, and the issue of damages was tried before a jury. The jury returned a special verdict in the amount of $486,004.10, including $240,000 for lost future earnings and $50,000 for future pain and suffering. The trial judge discounted the future earnings and pain and suffering components of the jury award by subtracting 2% of the sums awarded. Delta appeals on the grounds that certain evidence regarding Oliveri's future earning capacity was improperly admitted and that the present value calculation was incorrectly performed. We conclude that the evidence regarding earning capacity was admissible but that the discounting was performed incorrectly. We reverse and remand, unless the plaintiff agrees to a remittitur.

## Background

On June 27, 1984, Oliveri was injured while working aboard Delta's ship SANTA ROSA, when a spreader weighing several tons fell on his right foot. Three of Oliveri's toes were fractured, and two digits of the second toe eventually had to be amputated. At the time of his injury, Oliveri was working as an unlicensed seaman. He had been attending marine engineering school in order to obtain a marine engineer's license. After the injury, Oliveri continued his course of study in the hope that his injury would heal. He passed the Coast Guard licensing exam and was licensed as a third assistant engineer of steam vessels. He applied for membership in the marine engineers' union, District 2 Marine Engineers Beneficial Association, but was not accepted because he was deemed unfit for sea duty as a result of his foot injury. He has been considered medically unfit for sea duty ever since.

Oliveri commenced this action under the Jones Act to recover damages for his injuries. Delta conceded liability, and the issue of damages was tried to a jury before Judge Knapp. At the trial, Oliveri presented the testimony of William Powers, an official from District 2 Marine Engineers Beneficial Association. Powers testified as to compensation rates for third, second, first, and chief marine engineers. He also testified as to how individuals were promoted through these ranks and the average number of years experience needed before each promotion. Over Delta's objection, Judge Knapp admitted the testimony on the theory that Oliveri's future earnings would be affected by any promotions he might have received. In the course of Powers' testimony, the jurors were instructed that whether Oliveri would in fact have received any promotions was a question for them to decide.

Dr. Thomas Fitzgerald, an economist, testified for the plaintiff concerning lost wages. Based on Powers' testimony as to compensation rates for marine engineers, Fitzgerald prepared charts showing what Oliveri's lost past and future wages would be based on different assumptions concerning Oliveri's future employment. Fitzgerald prepared eight charts, representing the combinations of four different engineering positions (third, second, first, and chief engineer) and two variations as to average length of time at sea per year (six and eight months). For example, chart 1 assumed that Oliveri would always remain a third assistant engineer and would average eight months at sea each year, while chart 8 assumed that Oliveri would become a chief engineer by April 1990 and would

average six months at sea each year. Each chart contained a figure for total lost future earnings. Dr. Fitzgerald testified that this figure was computed by projecting Oliveri's expected earnings, adjusting upward for inflation by approximately 4.1% per year, and then discounting the inflation-adjusted income stream to present value by using a discount factor of 6.5%, which Dr. Fitzgerald testified was an historical average of low-risk interest rates. Each chart stated that the discount rate employed was 6.5%.

The parties discussed the discounting issue at several pre-charge conferences. Plaintiff contended that discounting should be performed by the jury, that the proper rate was approximately 2% (the difference between the interest rate and the inflation rate testified to by his expert), and that the expert's figures already presented properly discounted figures for future earnings. Defendants expressed a willingness to have the District Judge do the discounting but urged that the rate to be used should be 6.5% (the interest rate used by plaintiff's expert, unadjusted for inflation). Neither side clearly articulated the precise method by which discounting should be accomplished. Plaintiff presumably believed that the right method was the one reflected in the present value discount tables used by his expert. Defendants said nothing helpful on this score before the verdict, but argued strenuously after the verdict that traditional present-value discounting should be done. Judge Knapp concluded that the parties had stipulated that he would do the discounting and that he would do so simply by reducing the future components of the jury's award by 2%, i.e., subtracting 2% of the amount of such components and including the remaining 98% in the judgment. Judge Knapp recognized that this was not the way discounting was "ordinarily" done, but believed that this was the method he had discussed with counsel and that they had agreed to it.

The jury was instructed that they should not be concerned with discounting to present value but that they should be aware that "any future figures you give" would be reduced by 2%. The precise method of effecting the reduction was not explained. The jury awarded plaintiff a total of $486,004.10, identifying on a special verdict form damages components of $240,000 for future earnings, $50,000 for future pain and suffering, plus other amounts not at issue on this appeal, for medical expenses, past earnings, and past pain and suffering. Judge Knapp then discounted by subtracting 2% of $290,000, or $5,800, from the sum of the components for future earnings and future pain and suffering, and adding the balance of $284,200 to the other sums awarded, yielding a total award of $480,204.10 for which judgment was entered.

Delta moved pursuant to Fed.R.Civ.P. 59 to amend the judgment or for a new trial on the ground that the discounting was improperly performed. Judge Knapp denied the motion because he believed that the parties had stipulated to the method of discounting "to simplify the matter." Delta appealed to this Court but withdrew its appeal when it learned that the judgment was not final pursuant to Fed.R.Civ.P. 54(b) because a third-party claim for indemnification had not yet been adjudicated. Delta then sought and obtained certification so that an appeal would be permissible. Thereafter, Delta filed a second Rule 59 motion, challenging the damage award on the ground that Powers' testimony had been improperly admitted. Judge Knapp denied the second Rule 59 motion as untimely.

Delta appeals from the judgment and from the denial of both Rule 59 motions.

### Discussion

#### A. Powers' Testimony

Delta argues that Powers' testimony concerning the compensation rates for marine engineering positions that Oliveri never obtained was speculative and prejudicial. *See* Fed.R.Evid. 401, 403. Judge Knapp admitted the testimony, reasoning that future promotions could have a definite effect on Oliveri's lost earnings and that the question of whether Oliveri would have received the promotions was for the jury. Delta

responds that Judge Knapp permitted the jury to presume a "Horatio Alger scenario" that could never have occurred.

■ The admissibility of evidence regarding future earning capacity is within the wide discretion of the trial judge. *See O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 855 (2d Cir.1984); *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 207 (2d Cir.1984). Such evidence may be suspect if it is presented by expert witnesses who do not provide an adequate foundation for the assumptions they make. *See Shu–Tao Lin v. McDonnell Douglas Corp.*, 574 F.Supp. 1407, 1411–12 (S.D.N.Y. 1983), *aff'd in part, rev'd in part on other grounds*, 742 F.2d 45 (2d Cir.1984); *O'Rourke v. Eastern Air Lines, Inc., supra*, 730 F.2d at 855; *Benjamin v. Peter's Farm Condominium Owners Ass'n*, 820 F.2d 640, 643 (3d Cir.1987). However, where projections of future earnings are supported by empirical evidence such as contracts or wage scales, such evidence is admissible notwithstanding that the plaintiff might not have progressed as he anticipated. In *Bower v. O'Hara*, 759 F.2d 1117 (3d Cir.1985), for example, the plaintiff was permitted to introduce union contracts for carpet layers in New York City on the theory that he had intended to pursue his profession in New York. *Id.* at 1127. The fact that, at the time of his injury, the plaintiff was not a union member nor in New York "went only to the weight, not to the relevancy of the evidence." *Id. See also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 535 & n. 14, 103 S.Ct. 2541, 2549 & n. 14, 76 L.Ed.2d 768 (1983) (raises, promotions, and career changes may be reliably demonstrated for some workers).

■ In the present case, the trial judge did not exceed his discretion in admitting Powers' testimony. First, Powers testified from his personal knowledge about compensation rates for marine engineers in the union where he had worked for fifteen years. He represented that he was familiar with contracts covering the four classes of marine engineers, and he recounted the compensation and benefits provided for in these contracts, which were in evidence. Second, the jury was given a sufficient basis on which to assess Oliveri's chances of promotion. Powers testified as to the qualifications for each position for which he offered compensation data. He also testified as to the difficulty of the various qualifying exams and the average number of years it took individuals to proceed through the ranks. Finally, the jury was clearly instructed that Powers' testimony as to compensation rates was relevant only if the jury found that Oliveri would have been promoted.[1] Since the jury was presented with first-hand testimony regarding Oliveri's chances for promotion and the earnings he could be expected to receive, and was instructed that it could reject the promotion theory altogether, admission of Powers' testimony was proper.[2]

## B. Discount Rate

1. *Future Earnings.* We have previously explained in some detail the proper

---

1. Judge Knapp explained to the jury:

    The theory on which this witness is testifying is that but for this accident he would have become a member of this union and then would have progressed through the various stages that this witness will tell you about.

    This is only relevant if you accept that theory—that is, if you believe the plaintiff. The plaintiff has the burden of proving to your satisfaction by a preponderance of the evidence—and I will tell you what that means when the time comes—that in fact but for the accident he would have been a member of the union and having become a member would have gone on to do this work. Those things aren't automatic. He has the burden of establishing to your satisfaction that is what would

have happened, and if he does then you can consider these figures that he is giving as to probable earnings.

    The fact that I am submitting this evidence to you, or permitting it to be submitted to you, shouldn't suggest to you that I think that he has established or can establish it, and the fact that I disclaim it doesn't mean I think he can't or won't. That's not my business. That's your business.

2. Because we determine that Powers' testimony was properly admitted, we need not consider whether Delta's second Rule 59 motion, filed within ten days of the amended judgment but more than ten days after the original judgment, was timely.

method of discounting a future income stream to present value. *See Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2d Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); *see also Jones & Laughlin Steel Corp. v. Pfeifer, supra,* 462 U.S. at 533–52, 103 S.Ct. at 2548–58; *McCrann v. United States Lines, Inc.,* 803 F.2d 771 (2d Cir. 1986); *Van Nijenhoff v. Bantry Transportation Co.,* 791 F.2d 26, 27 (2d Cir.1986); *Crane v. Consolidated Rail Corp.,* 731 F.2d 1042, 1051–52 (2d Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984). Our approach takes into account two matters—inflation and the opportunity to invest money. Because a dollar received in the future will almost surely have less purchasing power than a dollar has today, we have required estimates of lost future earnings to reflect the effect of inflation.[3] In addition, because a dollar received today may be invested and produce a larger sum of money in the future (even though that sum will have less purchasing power than an equivalent sum has today), we have required that damages for loss of earnings that would have been received in the future must be discounted to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future. The degree to which inflation is taken into account depends on what the fact-finder concludes the average rate of inflation will be over the time period in which the wages, lost because of the injury, would have been received. The degree to which these lost wages are discounted to present value depends on what the fact-finder concludes the interest rate for virtually risk-free investments will be over the same time period. Obviously neither rate can be ascertained with certainty. That is why we have suggested that both sides in cases involving loss of future earnings might deem it sensible to forgo the time and expense of offer-

ing evidence as to their predictions of inflation and interest rates and instead agree upon an inflation-adjusted discount rate of 2%, *i.e.,* a rate that assumes, in line with considerable historical data, that the interest rate averages close to two percentage points above the inflation rate. *See Doca, supra,* 634 F.2d at 39 & n. 10. Or, to put the matter differently, the true cost of borrowing money is about 2%, since lenders generally charge an interest rate that exceeds by two percentage points their estimate of the inflation rate.

If contrary to our suggested use of a 2% discount rate, the inflation and interest rates are submitted for decision by the fact-finder on conflicting evidence, the significance of inflation may be recognized in either of two ways. One way is to increase the estimated future earnings by the estimated inflation rate. The other way is to decrease the interest rate that will be used to discount the sums awarded by subtracting the estimated inflation rate from the estimated interest rate to arrive at an inflation-adjusted discount rate. Obviously, it would be incorrect to use both methods. Moreover, whenever inflation is recognized, either by increasing the earnings stream or reducing the discount rate, care must be taken not to include in the estimated future earnings any cost-of-living increases that would have occurred. The plaintiff is entitled to project an increase in earnings attributable to promotions, but if the projected earnings include cost-of-living increases, then any further adjustment for inflation would be double counting.

Once inflation has been taken into account, there remains the mechanical task of applying the discount rate to the estimated future earnings. This calculation reflects the fact that the plaintiff receiving the award of lost future wages has an opportunity to invest that sum. Since the injury has deprived the plaintiff of a stream of

---

**3.** Of course, many people expecting money to be paid in the future have no assurance of an upward adjustment to reflect the loss of purchasing power due to inflation. Social security beneficiaries are an obvious example. But those receiving public benefits have the opportunity to mobilize political support for cost-of-

living increases or even indexing, and those who contract for future payments can bargain over the extent to which future payments should be adjusted in light of inflation. Tort victims, on the other hand, have none of these opportunities.

earnings that he would have received each year (during his working years), the discount calculation requires a determination of what sum of money the plaintiff should receive now that can be invested at the pertinent rate to produce each annual installment of earnings in the year it would have been received.[4] The estimated future earnings are divided into yearly components, each year's component is discounted to present value, and the sum of the discounted installments is aggregated to reach the amount to be awarded. Tables are available to calculate the results of this "year-by-year" method for different numbers of years and different rates.

In this case, both sides agree that Judge Knapp's method of discounting—reducing the estimated future wages by 2%—was incorrect. The significance of the error can be readily illustrated, using a rate of 2%. Under Judge Knapp's approach, the amount to be awarded now to replace $20,-000 of earnings that would have been received in 20 annual installments of $1,000 is $19,600. In fact, the correctly discounted amount in this example is $16,350. From the transcript of the post-verdict colloquy, it is apparent that Judge Knapp fully understood that the flat 2% subtraction was not the method "ordinarily" used. He used it only because he thought the parties had agreed to it. Although it is understandable why Judge Knapp might have reached this conclusion from the somewhat disconnected remarks of counsel, we are satisfied that the parties never stipulated to the incorrect discounting method.

Though in agreement on appeal that the simple 2% subtraction method was incorrect, the parties disagree as to what should have been done. Oliveri, maintaining his trial position, argues that discounting was the jury's task. However, he seeks no retrial to have a jury perform this task and has not taken a cross-appeal to secure any additional relief. His principal contention is that the trial judge should not have discounted the jury's award of future earnings by any method because the only evidence on future earnings, the figures in Dr. Fitzgerald's charts, had already been properly discounted to present value. According to Oliveri, the jury's future earnings award, though less than Dr. Fitzgerald's already discounted figures, was based on his method of discounting, and any further discounting is therefore a windfall to defendants. Though this contention, if correct, would warrant increasing the judgment to eliminate Judge Knapp's 2% reduction, Oliveri has not sought such relief; he simply wants us to uphold the judgment as entered.

We cannot accept Oliveri's contention that any discounting by the trial judge of the jury's future loss components is a windfall. It is true that the future earnings figures in Dr. Fitzgerald's charts were properly discounted to present value. The income projections in those charts were increased by an inflation factor of 4.1% and then discounted by a 6.5% market discount rate using the year-by-year method. If the jury had accepted this approach and included Dr. Fitzgerald's adjustments in its future earnings award, no further adjustment would be warranted. However, the jury was specifically instructed to return an *undiscounted* future earnings award. The jury was told:

> any future figures you give will be reduced by 2 percent which ... is a fair division between inflation and what we call discounting....

---

**4.** It should be noted that this is not the same as determining the sum to be received now that would produce the *total* amount of lost earnings at the *end* of the plaintiff's working years. That present value sum is obviously a much smaller sum than the amount needed to produce each annual installment of earnings in the year in which it would have been received. That lesser sum would undercompensate the plaintiff; he has been deprived of a series of payments that he would have received each year, not a lump sum that he would have received at the end of his working years. In fact, the plaintiff would probably have received his earnings in monthly, bi-weekly, or even weekly installments, and theoretically is entitled to a discount calculation reflecting the frequency of the payments he would have received. For convenience, discounting of future wages has customarily been done by reference to tables that discount future sums as if they would have been received in annual installments.

I want to make it perfectly clear, it is not your responsibility to take the two percent off. That comes off whatever you fix. You just forget about the 2 percent just like you forget about taxes. You concentrate on what the figure should be, and we will take care of the 2 percent, but just be aware that whatever figure you fix is going to be 2 percent less, the second part, the second part for the future is going to be 2 percent less.

We are mindful that discounting instructions are potentially confusing and that a jury might not always adhere to them, *cf. Crane v. Consolidated Rail Corp., supra,* 731 F.2d at 1051 n. 7, but Delta is entitled to have the award against it reviewed on the assumption that this jury did as it was told. The jury was free to disregard Fitzgerald's figures and arrive at its own assessment of Oliveri's projected earnings, which, under the instructions, it should neither have adjusted for inflation nor discounted to present value.[5] That the jurors may have proceeded in this fashion is supported by the fact that the jury's award of lost future earnings was below the lowest figure on any of Dr. Fitzgerald's charts. Moreover, Dr. Fitzgerald's charts were not the only evidence of Oliveri's earnings. William Powers testified as to current compensation rates for marine engineers, and his figures were neither adjusted for inflation nor discounted to present value. Thus, we are entitled to assume that the jury did not discount its award for future earnings.

■ Though the jury did not perform the discounting, it does not follow, as Delta contends, that we can now direct that the discounting be done, using the correct method. The calculation of damages is a task for the jury. We suggested in *Doca,* and repeat now, that it will ordinarily simplify the jury's task if the parties stipulate that discounting be done by the trial judge, leaving the jury to consider only the amount of wages, unadjusted for inflation, that the plaintiff would have received in the future. But neither we nor the district courts have authority to force the parties to so stipulate. *See St. Louis Southwestern R.R. Co. v. Dickerson,* 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303 (1985). In this case, plaintiff explicitly declined to withdraw the discounting task from the jury. Moreover, he presented evidence of both inflation and interest rates. In these circumstances, we cannot, as Delta urges, direct the District Judge to discount the jury's award. However, though the plaintiff was entitled to have the jury do the discounting, he should not now be required to endure a new trial simply because his request was not honored, and thereafter an incorrect method of discounting was used. Instead, it is appropriate to use the remittitur device, whereby a new trial will be ordered only if the plaintiff refuses to accept a reduction in the award.

Clearly the amount of that reduction must be determined by using the correct method of discounting. Delta did not agree to the trial judge's subtraction method and is entitled to a properly calculated discount. Dispute remains, however, as to the proper discount rate. Delta contends that the discount rate should have been 6.5% instead of 2%, because the higher figure, used by Dr. Fitzgerald, was the only discount factor mentioned in the evidence. Delta, however, ignores the fact that Dr. Fitzgerald used 6.5% as an interest rate appropriate for use as a discount factor only against future earnings adjusted for inflation. Since the jury was told not to consider either interest or inflation, it would be incorrect now to use a 6.5% rate to discount the jury's award of future wages that have not been adjusted for inflation. If the plaintiff elects to accept a remittitur, the reduction should be made by discounting to present value on a year-by-year basis the jury's future earnings award, using a 2% inflation-adjusted interest rate. That is the rate we approved in

---

**5.** Plaintiff contends that it is "logical to assume" that the jury, contrary to the instructions, discounted its future earnings award because during the deliberations the jury requested an exhibit containing Dr. Fitzgerald's calculations, which included discounted figures. The fact that one or more jurors wished to see this exhibit is not a basis for concluding that the jury's ultimate decision disregarded the instruction not to discount.

Doca and one that approximates plaintiff's evidence, the only evidence in the record on this issue. The future earnings award should therefore have been reduced to $204,595.90.

If the condition of the remittitur is not accepted, then a limited new trial must be ordered. That retrial will be limited to the one discrete matter that was erroneously taken from the jury's consideration—the determination of an inflation-adjusted discount rate. Since there is no defect in the jury's determination of the amount of Oliveri's lost future wages, that amount need not be redetermined. *See Crane v. Consolidated Rail Corp., supra,* 731 F.2d at 1049–51. If this limited retrial occurs, the trial judge will then apply the discount rate determined by the second jury to the $240,-000 award made by the first jury.

2. *Future Pain and Suffering.* Whether an award for future pain and suffering should be discounted to present value is not as clear as with an award for lost future earnings. The latter is the jury's estimate from specific evidence of the actual amounts that would have been received by the plaintiff over the course of his working years. Since those dollars will be received now, rather than in the years they would have been earned absent the injury, it makes sense to discount them to present value. And since the interest rate used to discount to present value is a function of lenders' estimates of future inflation, it makes sense to reflect the likely inflation rate in the discounting process, either by adjusting the wages upward to reflect inflation or adjusting the interest rate downward to arrive at an inflation-adjusted discount rate.

With pain and suffering, however, as with other nonpecuniary losses (such as loss of consortium), the jury is not determining the precise amount of dollars the plaintiff would have received in future years. On the contrary, the jury is invited to select some general sum that the plaintiff should receive now as compensation for

the pain and suffering he will endure in future years. Normally, that sum is a round number, determined without any precise calculation. It is rather artificial to take such a number, whether $50,000 in this case or $1,000,000 in another case, and then refine it with precision to present value by an inflation-adjusted discount rate. On the other hand, the sum to be awarded is compensation for the pain and suffering to be incurred in future years and, since the money received now can be invested, it makes sense to give some recognition to the time value of money in determining the sum the plaintiff should have available now and during the future years throughout which his disability will continue.

Our Circuit's consideration of the issue of discounting damages for future non-pecuniary losses has produced varied results. In *Alexander v. Nash–Kelvinator Corp.,* 271 F.2d 524 (2d Cir.1959), an appeal after a bench trial, we discussed in detail the discounting of an award for future earnings of $12,720 to a wife and $11,600 to a husband. The trial judge had also awarded $145,000 to the wife and $32,500 to the husband for their non-pecuniary losses, specifically including future pain and suffering. On appeal, we revised the non-pecuniary awards as somewhat excessive but gave no indication that the future component of these awards should be discounted. Indeed, the round numbers awarded, $100,-000 and $30,000, make it obvious that the future pain and suffering components were not discounted. We next encountered the issue in *Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij,* 443 F.2d 76 (2d Cir.1971). Defendant's appeal challenged the trial judge's failure to instruct the jury to discount both future earnings and future pain and suffering. We agreed that discounting future wages was required but ruled that "an award for pain and suffering need not be discounted when it is in the form of a lump-sum, *see Rapisardi v. United Fruit Co.,* 441 F.2d 1308, 1312 N. 7 (2 Cir.1971)." [6] *Yodice, supra,* 443 F.2d at 77.

---

**6.** The cited footnote in *Rapisardi* contains an itemization of damages, indicating that the award for future earnings had been discounted, and the award that included future pain and suffering had not been discounted.

The prospect of discounting awards for future non-pecuniary losses first emerged in this Circuit in *Chiarello v. Domenico Bus Service, Inc.*, 542 F.2d 883 (2d Cir. 1976). The jury was there asked to determine amounts for lost future earnings, future pain and suffering, and loss of future consortium. The jury was also asked to determine the plaintiff's work expectancy (absent the injury), his life expectancy, the inflation rate, and the discount rate, and was told that the judge would make the discount calculations. The judge did so, discounting the future earnings and the awards for non-pecuniary losses by the inflation-adjusted discount rate. We ruled that discounting future non-pecuniary losses was "not only appropriate but preferable." *Id.* at 886. We implicitly endorsed this view in *Espana v. United States*, 616 F.2d 41, 44–45 (2d Cir.1980), approving application of a below-market discount rate to an award for future pain and suffering; the plaintiff had objected to an alleged failure to take inflation into account but had not questioned the propriety of discounting a non-pecuniary loss. The *Chiarello* approach was explicitly followed in *Gretchen v. United States*, 618 F.2d 177, 181 (2d Cir.1980), in which we directed the trial judge on remand to separate the past and future components of pain and suffering and to discount the future component.

We implicitly returned to the *Yodice* rule when the matter next arose in *Doca*. We discussed at length the proper method for discounting future earnings but gave no indication that discounting should apply to the award in that case for a non-pecuniary loss of future consortium. *See* 634 F.2d at 33, 40.

Then, in *Metz v. United Technologies Corp.*, 754 F.2d 63 (2d Cir.1985), we followed the *Chiarello* approach and held that it was error not to instruct a jury, upon request, that future pain and suffering should be discounted.[7] *Metz* was a diversity case governed by Louisiana law, but the opinion acknowledged the lack of any perti-

nent Louisiana authority, *id.* at 66, and decided the issue by searching for " 'the correct result.' " *Id.* (quoting *Chiarello, supra,* 542 F.2d at 887 n. 5). *Metz,* however, introduced considerable flexibility into the task of discounting future pain and suffering awards:

> On retrial, the trial court need not use any particular formula or method of discounting. After considering the relevant economic evidence it may choose to offset inflation and interest, or it may choose to have the jury find and apply an appropriate rate. All that is essential is to reach a result that properly takes into account the time value of money.

754 F.2d at 68 n. 3. We again followed *Chiarello* in *DeChico v. Metro–North Commuter R.R.*, 758 F.2d 856, 859–61 (2d Cir.1985).

Our most recent encounter with the problem is *McCrann v. United States Lines, Inc., supra.* We there discussed in detail the appropriateness of discounting lost future earnings but, implicitly reverting to the *Yodice* rule, did not require discounting of an award for pain and suffering, an award that the trial court's unreported opinion had carefully separated into past and future components.

The other circuits that have considered the issue have all agreed that awards for future non-pecuniary losses should not be discounted to present value. *Taylor v. Denver & Rio Grande Western R.R.*, 438 F.2d 351, 353 (10th Cir.1971); *United States v. Hayashi*, 282 F.2d 599, 606 (9th Cir.1960); *Texas and Pacific Ry. v. Buckles*, 232 F.2d 257, 264 (5th Cir.), *cert. denied,* 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498 (1956); *Chicago & N.W. Ry. v. Candler*, 283 F. 881, 885 (8th Cir.1922) ("The arbitrariness and artificiality of such a method is so apparent that to require a jury to apply it would, we think, be an absurdity."). Most state courts also disapprove of discounting awards for future non-pecuniary losses, *see, e.g., Braddock v.*

---

**7.** A year before *Metz,* an opinion written by the author of *Yodice* had included a footnote that seems to approve permitting a jury to discount awards for future non-pecuniary losses, al-

though the footnote expressed doubt that the jury could do so with the evidence presented. *Crane v. Consolidated Rail Corp., supra,* 731 F.2d at 1051 n. 6.

*Seaboard Air Line R.R.*, 80 So.2d 662, 668 (Fla.1955); *O'Hara v. City of Scranton*, 342 Pa. 137, 139, 19 A.2d 114, 115 (1941); *Parrott v. Edwards*, 113 Ga.App. 422, 431, 148 S.E.2d 175, 182 (1966); *Missouri Pacific R.R. v. Handley*, 341 S.W.2d 203, 205 (Tex.Civ.App.1960); *Hall v. Chicago & N.W. Ry.*, 349 Ill.App. 175, 192–93, 110 N.E.2d 654, 661–62 (1953), although there is a minority view, *see, e.g., O'Brien v. Loeb*, 229 Mich. 405, 408–09, 201 N.W. 488, 489 (1924).

■ If we were writing on a clean slate, we might be inclined to accept the view of the other circuits and reject any discounting of future non-pecuniary losses. However, we are obliged to reckon with the clear preference for discounting expressed by this Circuit in *Chiarello, Gretchen, Metz,* and *DeChico,* even though these decisions are not readily harmonized with the pointed lack of such discounting in *Alexander, Doca,* and *McCrann,* and the outright rejection of such discounting in *Yodice.* We have concluded that the appropriate course is to accept the concept of discounting awards for non-pecuniary losses, but to forgo the precision appropriate for discounting future earnings. Since an award for a non-pecuniary loss is not a payment in lieu of a series of annual installments, as is the case with future wages, it is artificial to expect the fact-finder to divide non-pecuniary damages into yearly installments, discount each to present value, and aggregate the resulting figures.[8] Even though the trial judge could, by stipulation, do the discounting from tables once the jury has selected a lump sum for non-pecuniary losses, use of such tables is appropriate only for awards, like earnings, that replace annual payments. In making an award for future pain and suffering, the fact-finder is not determining the aggregate of payments that would have been made to the plaintiff over the duration of the disability. Rather, the fact-finder is determining the sum that the plaintiff should have now as compensation for the pain and suffering he will endure. No doubt many juries intuitively make some sort of rough present value discount in determining awards for non-pecuniary losses, recognizing that their awards may be invested.

■ As we noted in *Metz,* all that is required for awards of non-pecuniary future damages is that the time value of money be "take[n] into account." 754 F.2d at 68 n. 3. That should be done by the same fact-finder that determines the amount of the award, without any precise mathematical adjustments. The time value of such an award is sufficiently recognized by permitting defendant's counsel to argue that awards for future non-pecuniary losses are being received now, rather than in the future, and may be somewhat reduced to reflect the opportunity to invest such awards, and to permit the plaintiff's counsel to point out that any such reduction may be tempered by the likelihood that inflation will reduce the purchasing power of any sum awarded. If requested to do so, the trial judge can bring these general considerations to the jury's attention but should make it clear that the precise method appropriate for discounting awards for pecuniary losses need not be followed. This form of generalized consideration of discounting awards for non-pecuniary losses will be appropriate both for cases in which the discounting of awards for pecuniary losses is done by the jury, aided by

8. In *Chiarello,* the trial court discounted the jury's $230,000 award for future pain and suffering by 3½% over a 32–year life expectancy, yielding a discounted figure of $137,048. 542 F.2d at 886 n. 4. Analysis of these figures reveals that the year-by-year method was used. Analysis of the figures in *Espana* also reveals that the year-by-year method was used to discount an award for future pain and suffering. The discounted sum, $46,968, resulted from applying a 5% discount rate over a 13–year period to an initial award of, presumably, $65,000. *See Espana v. United States, supra,* 616 F.2d at 43 n. 1, 44.

experts' calculations, and in cases where, as we have suggested, the parties stipulate to have the judge discount awards for pecuniary losses, using a 2% rate (if the parties agree), or whatever other rate the parties agree upon. Use of this generalized approach to discounting future non-pecuniary losses should, in practice, minimize the significance of our difference with other circuits on this issue.

In this case, it would therefore have been preferable to leave the general consideration of the time value of the future pain and suffering award to the jury, as the plaintiff urged at trial. Since his request was denied, we now face several choices, none of which is ideal. We could order a new trial on damages, but that would be unfair to the plaintiff, who should not lose the award he obtained just because the discounting task was taken from the jury over his objection. We could use the remittitur device, just as we have for future wages and determine a remittitur amount by using the correct discount method and a 2% inflation-adjusted discount rate. That solution, however, would apply to an award for a non-pecuniary loss the "delusive exactness," *Conte v. Flota Mercante Del Estado*, 277 F.2d 664, 669 (2d Cir.1960), that we have rejected for such awards. We could leave undisturbed the District Judge's 2% subtraction, amounting to $1,000, but that would reflect approval of an incorrect discounting method. Finally, we could permit the plaintiff to recover in full the $50,000 the jury awarded. That result may seem unfair to Delta, yet we suspect that had this jury been given the generalized advice concerning discounting that we conclude is appropriate for non-pecuniary future losses, it would most likely still have awarded $50,000. Our conclusion, under all the circumstances, is to let the $50,000 award stand. This result will be accomplished by subtracting the $1,000 (by which the $50,000 was reduced) from

the sum to be remitted to reflect the correct discounting of the future earnings.

### Conclusion

The judgment of the District Court is reversed and the cause remanded for a new trial only to determine an inflation-adjusted discount rate, unless the plaintiff accepts a remittitur in the amount of $29,604.10,[9] leaving a revised judgment in his favor of $450,600.00.

---

9. The future earnings award as discounted by the District Court was $235,200. As correctly discounted (at 2%), it is $204,595.90. The difference is $30,604.10. Subtracting the $1,000

discount of the award for future pain and suffering, which we have decided to restore, yields a net remittitur of $29,604.10.